## THE SOMERVILLE AND EASTON RAILROAD COMPANY ADS. JOSHUA DOUGHTY.

1. If a party, in cross-examining a witness of the other side, ask whether the party whose witness he is has had a conversation with him on a certain subject, without showing what was said, the party producing him has a right, on re-examination, to show what that conversation was. OGDEN, J., dissenting.

2. In assessing damages for crossing land by a railroad, the jury must take into consideration the deterioration in value of the adjacent parts of the same tract by the proximity of the railroad, either for agricultural purposes or for sale as building lots, the increased risk of and increased care required for family and stock, the risk of fire, the inconvenience caused by embankments and excavations, and the obstruction to the free use of the buildings. OGDEN, J., dissenting, as to risk to family and stock and by fire.

3. The present value of lands taken must be awarded, and damages to adjoining lots must be assessed on the basis of their present value: but, to ascertain the present value of lands, it is right to regard their location, and to judge by the probable uses to which they will be put, and for which they can be sold, in the same manner as their value would be fixed by a prudent seller or purchaser.

4. A jury, in assessing the value of lands, are not to be governed by the prices which they would bring at a forced cash sale, but by such price as they believe the lands would bring in the hands of a prudent seller, at liberty to fix the time and conditions of sale.

5. It is not competent to rebut the opinions of witnesses who think that the proximity of a railroad would injure the value of building lots, by showing that, in point of fact in other places, a like proximity has increased their value. It would raise too many collateral issues. OGDEN, J., dissenting.

On rule to show cause why verdict assessing value of land taken by the company, and damages done thereby, should not be set aside.

Argued before Justices NEVIUS, CARPENTER, and OGDEN, by *F. T. Frelinghuysen* and *Williamson*, for the rule, and *G. H. Brown* and *Vroom*, against it.

NEVIUS, J. This cause was tried upon a feigned issue, made in this court, before the Somerset Circuit, in the term of February, 1849, and a verdict rendered for the plaintiff for $6800. The defendants ask that this verdict shall be set aside, and a new trial granted, for reasons hereafter mentioned.

The defendants are a railroad company, incorporated by act of the legislature of this state on the 26th of February, 1847,

with power to construct a railroad from the village of Somerville to the Delaware river. To carry out the object of their creation, their charter provides, that in case they cannot agree with the owner of lands necessary for the construction of said road, commissioners shall be appointed by a justice of this court, who shall examine and appraise the land required, and assess the damages of the owner, and make a just and equitable estimate of the value of the land and assessment of the damages. It further provides, that if either party shall be dissatisfied with the report of the commissioners, this court may, upon proper cause shown, set aside such report, and award a trial by jury. In this case it appears that the defendants required, for the location of their road, a part of the plaintiff's lands, situate in the village of Somerville, and, being unable to agree with him for the same, caused a particular description of it to be made in writing, under the oath of a proper agent or engineer, as required by their charter; and thereupon commissioners were appointed, who made their report of the value of the land thus required, and the damages which the plaintiff, as owner, would sustain, amounting in the whole to $3060. The plaintiff, not being satisfied with their report, applied to this court to set it aside, which, for proper cause shown, was done, and a trial by jury awarded. This trial, according to the requirements of the act, was to be before a select or struck jury, who were to have a view of the premises before trial. All these provisions, in the present case, were complied with. An issue was formed; a jury selected, who had a view of the premises; a trial was had; and, upon evidence, a verdict was rendered for the plaintiff for the sum above mentioned.

This verdict the company insist ought to be set aside, on the ground that it is exorbitant and excessive; and this general exception seems to include all other objections to it, because, they say, if the jury were not influenced by passion, prejudice, ignorance, or corruption, they were misled and misinstructed by the court, and, in either case, the verdict is wrong, and ought to be set aside.

The verdict, as I have said, is $6800, more than double the amount awarded by the commissioners, and it covers or in-

cludes the estimate which the jury have made of the value of the land and materials taken, and the damages sustained by the plaintiff. This, it is insisted, is exorbitant and excessive, and evinces passion, prejudice, or corruption in the jury; or is evidence of some palpable mistake, into which they were either led by the court or accidentally fell in the progress of the trial.

The first and natural inquiry will be, whether there is to be found in the case, as here presented, any thing to impeach the conduct of the jury, or to excite a suspicion of their integrity or impartiality, except the mere amount of their verdict. They were selected from the most respectable class of freeholders in the county, as is ordinarily the case where questions of importance are to be submitted to the decision of such a tribunal. Each party exercised the right of striking twelve, from the panel of forty-eight jurors thus selected, leaving the remaining twenty-four to be summoned for the trial of the cause, the first twelve of whom that appeared were sworn to try this issue, no objections being made. Thus it may be said, that the parties had, to a great extent, their own choice in the tribunal which was to determine their case. Were they mistaken in the character, intelligence, or integrity of the men thus selected ? There is no evidence of any misbehavior on the part of the jury, or that they did not attentively listen to the testimony of witnesses and the arguments of counsel during a protracted trial ; nor is there any proof of bias, or passion, or prejudice, in their minds, unless it is found in their verdict. This court has the power to set aside this verdict; but we will not exercise that power, unless we are clearly satisfied that it is wrong, exorbitant, and oppressive, and so much so as to strike the mind of every reasonable man, at once, that the jury, from some cause, have done the defendants gross injustice. We cannot exercise this power rudely because we may think the verdict too high ; we cannot convert ourselves into a tribunal of fact ; the law has not invested us with that power, and if it had, we should be very incompetent to exercise it in this case, as we have had no view of the premises, nor seen the witnesses, nor heard the testimony, as given upon the trial. We could not,

therefore, say, with any certainty, what is the true value of the land taken and the exact quantum of damages sustained.

Is this verdict then, upon its face, exorbitant and oppressive? Is it sustained by the evidence upon which it purports to be founded? We may pronounce on that question, and therefore will examine the evidence, as here presented. This shows that the land taken from the plaintiff is seventy-seven hundredths of an acre, carved out of a lot or tract of fifteen acres, situate in the village of Somerville. It appears, by a map exhibited on the trial, and produced here, that the line of the road crosses this tract in an oblique or diagonal direction, running through the plaintiff's court yard, attached to his mansion house, and within thirty-six feet from the corner of his house, destroying the regularity and symmetry of his grounds and ornamental improvements. It further appears, by the same map and the evidence, that this tract has already been laid out in lots, and is adapted for buildings, either for business or residence; that many of these lots had already been sold, and the remainder had been devoted by the plaintiff to such purposes, and were then in market, and offered for sale as building lots. The jury had a personal view of the premises, and were thereby enabled to apply and appreciate the value of the evidence of the witnesses, and determine the weight of their opinions, and the reasons assigned for them. The plaintiff produced a number of witnesses residing in the immediate vicinity of the premises, and acquainted with, or professing to be acquainted with their value. These witnesses estimated the value of the lands taken by the company and the damages sustained by the plaintiff in his adjacent lands at various amounts, extending from $9900, the lowest estimate, to $10,984, the highest. And in making their several estimates of the depreciation in the value of the plaintiff's adjoining land by means of this railroad, their attention was called to the effect, or probable effect of the road upon the value of the lots, as laid down on the map exhibited. It will be seen that, in the general results of their estimates, these witnesses differed materially; and, on a careful examination of their evidence, it will also be seen that they assigned different reasons for their general conclusions, and made dif-

ferent estimates of the damages to the separate lots. These discrepancies are such, however, as might reasonably be expected in a case where there is no certain standard by which to measure damages or value, but where opinions of individuals, supposed to be acquainted with the subject, are necessarily resorted to as a guide to a decision. If such discrepancies had not occurred, the weight of the evidence would have been materially diminished, as it would have warranted a suspicion that there was concert, if not conspiracy, among the witnesses.

On the other side, the defendant also examined a number of witnesses, who estimated the value of the land taken and the damages sustained by the plaintiff at a sum far below the estimate of the witnesses for the plaintiff. But they, too, differ widely in their estimates, and the reasons given in support of them, the lowest being $2500, and the highest $3700. Some of these latter witnesses professed to know the value of these particular lands, having resided in their vicinity, and others were strangers to the price or value of lands in Somerville, and founded their opinions on estimates of lands in other places, supposed to be similarly situated on the line of a railroad. From this discordant testimony, it will be readily perceived, if the witnesses were equally intelligent and candid, and had equal opportunities of forming a correct judgment, that the duty of deciding between them would be no easy task for the jury. If the jury had attached implicit faith to the truth and soundness of the opinions expressed by the plaintiff's witnesses, their verdict must have been for a much larger sum; if they had taken the testimony of the defendants' witnesses as their guide, it would have been for a less sum. It seems that they did neither, but rendered a verdict for a sum intermediate these several estimates; and can we say, from this testimony, that they were wrong, and that their verdict is excessive? We have before us the evidence, in a state of the case prepared by the parties; and what, I ask, would be our verdict on that evidence, if called upon to render one? or could the members of this court agree upon a verdict at all? or if we could, what assurance would the parties or public have that it was more equitable and just, or more consistent with the

evidence than that which has been already rendered by the proper and lawful tribunal to which the questions have been submitted? Upon the evidence, then, the verdict, in my opinion, should stand, for I find nothing in it indicating passion, prejudice, or corruption on the part of the jury, nor is there in the sum awarded any thing that impresses my mind with the conviction that it is exorbitant.

Unless, therefore, it is shown that there were errors committed in the progress of the trial, by which the jury were misled, or which were calculated to mislead them, the rule ought to be discharged. Such errors are imputed to the judge who tried the cause. Let us examine them.

It is assigned for error that the court admitted illegal evidence for the plaintiff on the trial, to wit, the declarations of the plaintiff himself. The facts connected with this charge are these: The plaintiff produced Mr. G. as a witness, who, after being examined by him, was turned over to the defendants for cross-examination. On such cross-examination, he was asked by the defendants' counsel, whether the plaintiff had at any time told him how his property was injured by the railroad. His answer was in the affirmative. And there the cross-examination of the witness ended. He was then asked, by the plaintiff's counsel, what the plaintiff had said to him, as to the mode or manner in which he was injured by the road. To this question objection was made, but the court permitted it to be put; and the witness answered, " that the plaintiff told him he was injured in the sale of his lots."

I think the court was right in so ruling. It was manifest that the question put by the defendants was calculated, if not designed, to impute to the plaintiff an improper attempt to influence the witness's opinions, and to impair the credit of the witness, by producing an impression on the minds of the jury that he had been, or was influenced by such attempt. The plaintiff therefore, in all fairness, was entitled to overcome or avoid such impression, by explaining what, in truth, he had said on the subject. The court and jury had a right to know, that they might judge fairly of the conduct of the party and the credit of the witness. The conversation between the plain-

tiff and the witness was not in itself either unlawful or improper; and as it was introduced by the defendant, the plaintiff had a clear right to show what it was, that no false impressions should be left in the jury box touching his own conduct or the witness's conscience. There is no error in this ruling of the court, and for this reason the verdict should not be set aside.

The next ground urged for a new trial is, that the judge, in his charge, informed the jury "that they were authorized by law to ascertain and assess the damages sustained by the plaintiff to his other lands not taken and occupied by the defendants, to his dwelling house, and his other buildings and improvements, by reducing their value, changing their character, obstructing their free use, by subjecting his buildings to the hazard of fire, his family and stock to injury and obstruction in their necessary passage across the road, the inconvenience caused by embankments or excavations, and, in general, the effect of the railroad upon his adjacent lands, in deteriorating their value, in the condition they were found, whether adapted for agricultural purposes only, or, for dwellings, stores, shops, or other like purposes.

On a careful review of this part of the charge, I cannot see that any legal principle was violated, or any unsound doctrine advanced. The charter provides that the jury shall assess the value of the land and materials taken by the company, and the damages. The damages here contemplated are not damages to the land actually occupied or covered by the road, but such damages as the owner may sustain in his other and adjacent lands not occupied by the company's road. His buildings may be reduced in value by the contiguity of the road, and the use of engines upon it. His lands and buildings, before adapted and used for particular purposes, may, from the same cause, become utterly unfit for such purposes. The owner may be incommoded by high embankments or deep excavations on the line of the road, his buildings subjected to greater hazard from fire, his household and stock to injury or destruction, unless guarded with more than ordinary care. It requires no special experience or sagacity to perceive that such are the

usual and natural effects of railroads upon the adjoining lands, and which necessarily deteriorate not only their marketable, but their intrinsic value. The judge, therefore, did not exceed his duty in instructing the jury that these were proper subjects for their consideration, in estimating the damages which the plaintiff might sustain by reason of the location of this road upon and across his lands. It was not calculated to mislead the jury, but to direct them in the true line of inquiry upon the subject before them. The defendant's counsel, in their argument insisted, that the contingency of loss and destruction by fire from the use of the road ought not to have been taken into the estimate of damages, because, they say, if any such loss should occur from such cause, the defendants would be legally responsible for it. This answer is not satisfactory, for if such loss should arise without any culpable act, or any want of care on the part of the defendants or their agents in the lawful exercise of their franchise, it would be very questionable, to say the least, whether the owner would have a remedy by action against the company; but whether he would or not, if the hazard of fire is increased by the location and use of a railroad, then the value of adjacent buildings must be proportionably reduced.

Another error imputed to the charge of the court is, that they were instructed to compute prospective damages. On examining the charge which is before us, I find that the jury were told, in express terms, to estimate the present value of the lands taken by the company and the present damages sustained by the plaintiff in his other lands, and not future or prospective damages;" but, in laying down and explaining the rule to be adopted in making such estimate, they were further told, "that they should first determine, from their own view of the premises and the evidence in the case, whether these lands were to be considered and treated as lands adapted only for agriculture or as better adapted for buildings, and if they found that the plaintiff had actually laid them out in building lots, and devoted them to that purpose, and that they were best fitted for that purpose, they might then estimate the damage to each separate lot, or the depreciation in the value

of each, occasioned by the railroad. That, in making such es-
timate, they should not adopt the opinions of men who were
sanguine in their estimate of value, nor of men who were over
cautious, but of prudent and practical men, men of experience
and thought and consideration, and who have had an opportu-
nity of forming correct opinions of the value of " the lands and
damages at present sustained."

I deem it unnecessary to advert to other parts of the charge
on this point of the case. Its whole scope and tendency was to
direct the jury to assess the present value of the lands taken and
the present damages to the plaintiff's other lands. Whatever
else was said on the subject, was only in amplification and en-
forcement of the principle before plainly laid down.

It is further objected that the court erred in instructing the
jury that, in estimating the value of the lots before the con-
struction of the road, and their depreciation in value by means
of such construction, they were not limited to what they might
have brought at a cash sale before the road was made. With
the explanation accompanying this remark, I think the court
was entirely right. The jury were told that they were to put
such a price on the lots as they could be purchased at, pro-
vided they were for sale, and the owner asked such prices as,
in the opinion of the community, they were reasonably worth.
That the question was not what they would bring at a forced
cash sale, but what was their true intrinsic value in the hands
of a man who could select the time and fix the conditions of his
sales.

The company were taking compulsory, though legal pos-
session of the plaintiff's lands, and were charged with injuring
the value of lands adjacent and belonging to the plaintiff. The
standard of that value was, not the price they would bring at
a forced sale, but what, in the opinion of practical and judi-
cious men, they were reasonably worth, taking in view their
fitness for the purposes for which they were intended and the
time when, according to the reasonable and natural progress
of improvement and growth in that particular locality, they
would be required for those purposes. Whatever may be said
of the legality or policy of what are commonly called " stop

laws," they are all founded upon the universal experience, that property will not always bring at a forced sale what it may be really worth. Again, the present value of lands must often depend upon the future and prospective use to which they may, and probably will, in the natural growth of business and increase of a town, be appropriated.

It is further objected to this verdict, that the judge erred in his charge, in telling the jury, " that they might award damages for lots of the plaintiff not intersected by the road, nor immediately adjacent to it." The direction was rather to the principle and mode of computing damages, than to the property upon which they were to be computed. · It was the damages to the plaintiff's whole tract of fifteen acres which were to be assessed, and, whether assessed upon the tract as a whole, or upon different parts separately, the result would be the same if the jury considered the land, as laid out in lots, dedicated and designed for building, and best fitted and most valuable for that purpose. And in that case, by estimating the injury to each particular lot, the jury would arrive at a safe and more correct result than by estimating them on the whole as one entire tract.

It is also objected, that the court below overruled testimony, offered by the defendants, to prove the effect of railroads upon the value of lands at other places, and remote from the lands in question. I think this evidence was properly rejected; it was raising other and collateral issues, which would have led to an interminable trial, and cast little light on the true issue in this case. If the defendant had been permitted to prove the effect of a railroad upon lands at Plainfield, the plaintiff would have had an equal right to prove their effect on the value of lands at any other place, and such party would have been entitled to controvert the testimony of the other. This would have produced confusion, and distracted the minds of the jury, by leading them from the true issue, and could not have aided the cause of truth and justice.

Upon a careful review of the whole charge and of the trial below, I find nothing to justify our interference with this verdict.

Let the rule be discharged.

OGDEN, J.   The judicial discretion of the court has been invoked in this case by the defendants, who allege that they were deprived of the benefit of lawful testimony; that the verdict is against the weight of evidence given in the cause, and is also contrary to law.

Upon applications for new trials, the action of courts should be controlled by precedent or by the peculiar circumstances of a case, so as best to promote substantial justice.

While on the one hand, they observe great caution lest they should interfere with the appropriate province of the jury, on the other, they profess a willingness to interfere on all occasions where they are not satisfied that "there are strong probable grounds to suppose that the merits have not been fully and fairly discussed, and that the decision is not according to the truth and justice of the case." 2 *Green* 156.

For the purpose of understandingly disposing of the merits of this application, it is necessary that we should be possessed of the character of the issue, of the extent and nature of the evidence admitted and of that which was rejected, and likewise, of the principles of law in which the jury were instructed by the court.

The legislature of New Jersey, by an act, approved on the 26th of February, 1847, incorporated the defendants, and invested them with all the rights and powers necessary and expedient to survey, lay out, and construct a railroad, or lateral roads, from one or more suitable place or places in the village of Somerville to one or more suitable place or places within two miles of the Easton Delaware bridge, opposite to Easton, in the state of Pennsylvania.   It is declared, in the said charter, to be lawful for them to enter at all times upon lands, for the purpose of exploring, surveying, levelling, laying out, and locating their route, doing no unnecessary injury to private property; and, after the route should be determined on, and a survey thereof be deposited in the office of the secretary of state, it was made lawful for them to enter upon and take possession of any such required land, and to construct and use their railroad thereon, upon the conditions, and subject to the compensation provided for in the charter.

In case the company and a landholder are unable to agree for the use or purchase of any such required lands, the act provides for the appointment of three commissioners, to examine the land, and to make a just and equitable estimate or appraisement of the value of the same, and assessment of damages, to be paid by the company for such lands and damages. In the event of either party being dissatisfied with the report of commissioners, power is conferred upon the Supreme Court, upon good cause shown, to set aside the report, and to direct a proper issue for the trial of the said controversy to be formed between the parties, a jury to be struck, a view of the premises to be had, and the issue to be tried at the next Circuit Court to be holden in the county wherein the land lies, in the same manner as other issues in the said court are tried. It is made the duty of such jury " to assess the value of the said land and damages sustained."

To obviate unnecessary delay in the construction of the railroad, it is provided, that an application to set aside a report of commissioners shall not prevent the company from taking and appropriating the land, upon their filing the report and accompanying papers in the clerk's office of the county in which such land lies.

Hence all acts of these defendants, done in conformity with the foregoing provisions, were lawful acts, prescribed by the supreme power of this state. Moreover the company are required, in the seventeenth section of the charter, to execute the work contemplated in their creation within a limited period, on pain of forfeiting all their privileges.

While keeping within the lines of their act of incorporation, the company are neither *trespassers* nor *wrongdoers*. They approach and enter upon all lands by authority of law, and must be so viewed and dealt with by all tribunals within whose jurisdictions the charter has placed them.

This principle, repeatedly, has been declared by the justices of this court. Its observance lies at the foundation of all public improvements, and it behooves courts diligently to watch, lest its proper influence be disregarded, and punitive damages unjustly be assessed against aggregated capital.

The tendency of the public mind is against developments through the agency of associated enterprise. There is an inclination to view all acts of incorporated companies, which conflict with individual opinions, or seemingly interfere with private rights, as aggressions upon social privileges; and hence experience shows that when persons are invested with power to settle disputed questions of right between citizens and such corporations, the latter incur the hazard of being viewed and judged through a false medium.

" It is the glorious principle of our political equality, that the rights, privileges, liabilities, and property of all stand upon the same law."

Upon complaint, properly made, that the law has been violated, this court, in the exercise of its long admitted superintending power, will examine the grounds of dissatisfaction, and if they are substantial, it will administer the appropriate relief.

In the case before us, the Somerville and Easton Railroad Company, in building the road sanctioned and required by their charter, surveyed, laid out, and located a portion of it over the land of Joshua Doughty in the village of Somerville, and on the 25th of January, 1848, they deposited the survey thereof in the office of the secretary of state.

Being unable to agree with Mr. Doughty for the use or purchase of his land, so required by them, they caused such proceedings to be had, under the seventh section of their charter, that commissioners, duly appointed for the purpose, acted in the premises, and awarded the sum of $3060, as a just and equitable estimate or appraisement of the value of the land and assessment of the damages. Mr. Doughty was dissatisfied with the report, and, on application made in his behalf, this court set it aside, and directed a proper issue to be formed between the parties. The issue, so formed, was carried down for trial by jury, at the term of February, 1849, of the Circuit Court, held in the county of Somerset; and the *postea*, returned by his Honor Justice Nevius, shows that a verdict was rendered thereon for the sum of $6800.

Upon the coming in of the *postea*, a rule was granted, on

an application in behalf of the company, for the plaintiff to show cause why the verdict should not be set aside, and a new trial be awarded. Whether that rule shall be discharged or be made absolute is now to be determined.

The justice, at the circuit, was employed several days in receiving the proofs, during which time twelve witnesses were examined on the part of the plaintiff, and eighteen on the part of the defendants, whose testimony has been furnished to us in a state of the case.

Three principal questions were raised upon the argument of the rule.

1st. Did the justice err in declaring the law to the jury?

2d. Was the verdict *clearly* against the weight of evidence and contrary to law?

3d. Was any testimony offered by the defendants improperly ruled out, or any unlawfully admitted on the part of the plaintiff?

As the two first questions are necessarily connected by the verdict, it may be impracticable to keep them separate in the examination which I propose to institute.

It appears that the land of the plaintiff which is intersected by this railroad is a portion of a property purchased by him, in 1836, for $11,000, consisting of several acres of outland, and of about fifteen acres in the upper portion of the village of Somerville, on which was a spacious mansion house, a barn, and other outbuildings.

This house plot was bounded by the main street of the village and the road leading from Somerville to Raritan, by lands of Col. Southard, by the Raritan river, and by lands of Mr. Miller. The plaintiff, considering that some portion of this part of the property would be more valuable for building purposes than for farming, has designed and appropriated for such improvements a parallelogram, about 800 feet in width, between Col. Southard's and Mr. Miller's lands, and about the same depth, from Main street to a line some 200 feet in the rear of the mansion house: and, in mapping it for sale and use, he has laid down along his western boundary a proposed street, about twenty-five feet wide, to run from Main street

for some 300 feet towards the river; also a proposed street, about fifty feet wide, to commence at the terminus of the first mentioned proposed street, and to run to Mr. Southard's line. This street will pass within 100 feet of the front door of the mansion house, and be intersected by an avenue, about 48 feet wide, leading from the house to Main street, and also by a new street, already opened from Main street, 232 feet west of the avenue, and parallel with it. These streets and avenue will divide the plat into four blocks, which are designated as A, B, C, and D, the first three of which are laid out on the map into lots of various widths and depths.

The mansion house is on No. 7, in block C, and a lot is appropriated for it, 166 feet in front, and over 320 feet in depth.

It was alleged, by the plaintiff, that Col. Southard would have continued the street laid down in front of the mansion house through his lands.

The railroad location enters from Col. Southard's land upon the plaintiff's, a little below or south of the last mentioned proposed street, crosses a ravine of six or ten feet depth in lot 9, on block C, passes obliquely in front of the mansion house, its proximate line being 48 feet from the front door, occupies about 250 feet in length of the proposed street, in crossing the same, intersects and obliquely crosses both New street and the proposed western street, and thence passes off upon the lands of Mr. Miller.

Its entire length over the plaintiff's premises is about 850 feet, its width there is 40 feet. It occupies parts of nine lots, as plotted, including the front of the mansion house lot, appropriates .77 of an acre of the land, and the road laid there has required little if any excavation or embankment in its construction and use.

The plaintiff owns no building upon these premises which is within 100 feet of an outside line of the location of the railroad, excepting the main brick mansion house. A dwelling house on the same block, situate upon the lot facing the southern terminus of New street, and occupied by Mr. Gaston, appears, by the map and scale, to be some 120 feet from the nearest line of the railroad; and a lot and house of a Mr.

Mundy intervene between the railroad and the houses of the plaintiff which are erected on block B.

The mansion house had recently been repaired, at a cost of about $800. The house occupied by Mr. Gaston had lately been erected for about $3000, and the plaintiff's houses on block B had cost about $900, each.

There was no evidence that any special or unnecessary injury was done to the premises during the surveys and location of the road, or that the plaintiff made any complaint upon that ground.

The simple questions of fact are, whether the jury have put an exorbitant valuation upon the land of the plaintiff appropriated by the company, or have made an excessive and unlawful assessment of the damages contemplated in the charter, or have erred in both these matters.

The two assessments are blended in the verdict, which deprives the court from obtaining any accurate knowledge of the items making up the aggregate assessment.

The price for the title to the land required should have been estimated by the jury according to its true value at the time, irrespective of any damages flowing or to flow from the construction or use of the road ; and the real and actual damages, likewise, should have been assessed, not such as were ideal, imaginary, or speculative.

The jury should have been controlled, in reaching the compensation for the property taken, by the most valuable use which the plaintiff intended to make of it ; and as it was evident that he had appropriated it as best adapted for building purposes, he was entitled to have the value settled by that standard.

The quantity of ground required by the company was .77 of an acre, capable of making, without allowance for streets, 13½ building lots, of 25 feet by 100 feet, or about six lots of the size of those mapped by the plaintiff on blocks A and B. There was no evidence of sales by the plaintiff out of that part of the property which could aid the jury, excepting of the sale of one lot, for $200, to Mr. Mundy, nor was there proof of any present demand for the purchase of those lots.

If the jury were guided by the sale to Mr. Mundy, they must have fixed the value of the land required at twelve or fifteen hundred dollars; if they disregarded that sale, and placed their verdict upon the *opinions* of witnesses, we are met by the question, whether those *opinions* rested upon safe and legal foundations; whether the witnesses relied upon facts, or whether they testified upon speculative prospective value of the lots at future, and perhaps uncertain periods. The money becomes payable upon the rendition of a verdict; hence every mode of computation of value, which would lead to an appraisement beyond a present true and full compensation, must be grounded in error, and would render the *faithful* discharge of a juror's functions impracticable.

Who can judicially determine what the value of lots will be at a fixed postponed period? or who can settle the effect of contingencies with conscientious certainty?

Any departure from the principle, that the parties in such cases are to be held as vendors and vendees, differing only as to price, and that the price is to be determined by the criterion of the present true intrinsic value of the land, as designed for the most valuable use by the owner thereof, must result in an unsound verdict.

The company would be required to submit to an estimate, made at a time of actual sales, at inflated prices and under circumstances fortuitous for the landholder; and, upon principles of equal justice, they are entitled to have the land at its true value, when, in good faith and without seeking the benefits of a casual depression, they call for an appraisal. I do not mean to say that a company may take advantage of the market, and purposely have assessments made when business is prostrated, and property is unsaleable, with a view of obtaining their titles at depressed prices, because computations made upon such a state of business would not represent the intrinsic value of the property. A holder would not voluntarily sell under such circumstances, nor would a person purchase, unless with the belief that he was making a very favorable contract.

Assuming, however, that the proportion of the verdict which applied to the value of the land taken was made upon

correct principles and consistently with the evidence, is there good and sufficient ground for determining that the jury have erred in reaching the assessment of the damages sustained ?

It must be remembered that a portion of each lot that is intersected by the railroad has been compensated for in the estimate of value, and that damages, *as such*, could be assessed *only* for the depreciation of the remainder of each of those lots and of the residue of the property, or, in other words, after settling the price to be paid for the land actually appropriated by the company for their use, the jury were to inquire and determine how much less the entire property of the plaintiff, which was interfered with by the company, was worth to him, after the location and construction of the railroad than it was before.

That assessment must be just and equitable. It cannot be reached by arbitrary action. It should result from the *influence* of certain legal principles upon the evidence in the case, by which I mean not *simply* the opinions of witnesses, but *also* facts, so proved as to enable a jury to form a correct judgment of the value of those opinions.

While the amount should be sufficiently broad to cover all damages which may result from the natural and physical effects produced by the location, construction, and use of the railroad through the plaintiff's property, in deteriorating the value thereof, a jury should not attempt to reach, and to compensate for those imaginative damages which capricious and timid fancies may suggest, which cannot be measured by any certain criterion, and which need not *necessarily*, and probably never would be sustained.

It would be unsafe for the court to venture an enumeration of every species of injuries for which a land owner might be entitled to an assessment of damages, consequent upon the location, construction, and use of a railroad across his property ; nevertheless there are some elements of damages which are undisputed, as, for instance, the obstruction of the free use of the party's other lands, by the formation of an embankment or an excavation which would require, on his part, an increase of motive power or an unprofitable diminution in load-

ing in his necessary cartage over the same; the changing the character of his improvements; the impairment or destruction of some actual item of value; the expenses of erecting and maintaining two lines of fences along the length of the road, across his lands, for the purpose of perfectly protecting his premises, as well as his stock, from injury or destruction, and divers other items of damage, which "must depend upon the peculiar circumstances and situation of the land taken, and its relative position to other lands, property, or rights of the owner."

There are considerations, also, which should not enter the jury box, *to wit:* the interruption of a prospect; the noises occasioned by the passage of cars; the hazard of fire from the motive power usually employed; the risk of alarm to horses, and of destruction of vehicles, and of personal injury which might result therefrom; the danger that cattle and other live stock may be overtaken by the trains running upon the track, and be lamed or killed; the possibility that the land owner, his wife, his children, and domestics, or some one or more of them, may be maimed or crushed to death in their necessary passage across the railroad : these, and many other ideal, speculative, and unsubstantial elements of damages, are too contingent and casual in their natures to be susceptible of admeasurement, or of specific compensation, or of receiving just remunerative pecuniary equivalents for the injuries contemplated.

Entertaining these views, I respectfully must differ from parts of the doctrine held by the learned judge before whom the issue was tried, in that he instructed the jury, in his charge to them, that the damages intended by the legislature "must extend to all damages actually sustained by the owner to his other lands, to his dwelling house and the other buildings and improvements, by reducing their value and changing their character by obstructing their free use; by subjecting his buildings to the hazard of fire; his stock or the inmates of his house to injury or destruction in their necessary passage across the road;" and that those were fair legitimate subjects of con-

sideration in making up their award as to the amount of the plaintiff's damages.

While some of the matters repeated by the judge were proper subjects of consideration by the jury, others of them, in my opinion, were incapable of being estimated upon any certain principles of correct judgment. If recognised, they would cast the jury upon an open sea of conjectures and loose opinions, without a beacon to direct them " to the haven where they would be." The extent of an apprehended fire cannot be measured, nor can lives be valued in money. No amount of gold could restore a bereaved husband or father, or widow or orphan, to their former condition.

The act clearly intends prospective damages to arise from the construction and use of the railroad; but to give to language, " *damages sustained,*" the broad construction that might be claimed for it upon the ruling at the circuit, would subject *us* to the reproof of just criticism, as well as remove from the *jury* all restraints upon speculative and unconscionable assessments.

It is true that witnesses of the plaintiff, who spoke to that point, fixed the value of the lands taken and the damages beyond the sum assessed by the jury, one naming $10,984, another $10,700, and another $10,625, another $10,450, another $9500, while those produced by the defendants ranged, in their estimates, from $2400 to $3800; but upon a close examination of the grounds given by the former for those opinions, I am entirely satisfied that they are unsubstantial, and are not supported by facts. For example: in the sale and purchase made in 1836, the entire plot, extending from Main street to the river, embracing fifteen ·acres of land, well arranged for a gentleman's retired establishment, with its pleasant fields, studded avenues, spacious, substantial, and convenient mansion, provided with stables and other improvements, was estimated by the plaintiff at $7000.

*Before* the railroad was located, its unity had been assailed and broken. It had been mapped into lots, and the desirable retired dwelling was designed to be circumscribed within a lot 166 feet wide, and by a public street, 100 feet from the

front door, and yet those witnesses have estimated the house and lot, so hemmed in by building lots on either side, at prices varying from $6500 to $8000; and they have fixed the damage thereto at $3500, nay, one of them, at $4000, thus computing the injury by the railroad to this fraction of the property at a moiety of the assumed value of the whole plot in 1836. It is also observable, in their testimony, that, for the purpose of keeping up this scale of values and damages, they have estimated the property injured by the railroad, and upon which they have fixed more or less damages, at exceeding $25,000.

Upon what facts could such opinions have been based? Not upon actual sales and demand for lots in that tract, because none such appeared to any extent. Not upon values ascertained by the average selling price of land in the neighborhood of like quality, or by the prices at which other lots in and about the village, were sold : because it was an established fact, that plots with dwellings, in the immediate vicinity, and also lots upon an opened business street, had recently been sold at very much less rates, and that lots were in market seeking purchasers.

Although this verdict must appear to every disinterested person to be strikingly large, yet I should not be willing, on that account alone, to disturb it; but when I have searched in vain for any solid ground on which to place the inflated opinions of the witnesses, and am satisfied that those opinions are at variance with the facts which *should truly* demonstrate the value of the plaintiff's property, I cannot escape the conclusion, that the verdict is not only *against* the evidence, but that it is unsustained by the facts proved or by any just mode of computation.

My mind being at rest upon this branch of the argument, I should fail in discharging my duty here, did I not rule that the verdict should be set aside, and a new trial be granted.

If, however, I did not feel clear upon that point, I am satisfied that the justice misdirected the jury on material legal principles; that his expressed view must necessarily have tend-

ed to the prejudice of the defendants, and I think that, on this ground also, there should be a new trial.

Another objection remains to be considered :

It appears in the state of the case, that upon the cross-examination, by the counsel for the defendants, of Mr. Goltra, who had estimated the damages at $10,450, he testified, that Mr. Doughty had stated to him *how* he considered that the railroad injured him.

Upon a resumption of the examination in chief, he was asked "*what* Mr. Doughty said to him, as to the manner in which the road injured him." The question was objected to, upon the ground that the plaintiff was thereby efforting to give his own declarations in evidence. The objection was overruled, and the question was propounded and answered.

I am inclined to believe that the testimony was illegal. The defendants were not seeking for any part of that conversation, nor did they introduce any portion of it. It was proper for them to test the value of the witness's estimate, by showing *the fact*, that the plaintiff had expressed his views to the witness upon the question of his damages ; but the establishment of *that fact* did not, in my judgment, make the plaintiff's own estimate of his damages *competent* proof before the jury.

The ruling at the circuit did not come within the principle, that a party is entitled to have an entire conversation, if his adversary introduces garbled portions of it.

The defendants have also complained that the justice rejected legal evidence offered by them.

It was very material, that the jury should have every species of legal evidence that would enlighten them in reaching a proper estimate of the damages, which should be assessed for injuries to unimproved lots in the proximity of the railroad.

Witnesses for the plaintiff have established a scale of damages, diminishing in amount with the increase in distance from the track.

The defendants offered to prove, by Mr. Dunham, of Plainfield, that the railroad passes through a street in that village ; and that since its construction, building lots fronting on the railroad have been sold, and dwelling houses erected on them,

and that the lots *for building lots* had been enhanced in value. Objections were raised by the plaintiff to that offer, and were sustained by the justice.

I have not been able to discover wherein that testimony would have been incompetent, although its introduction might have prolonged the trial. If the witnesses of the plaintiff had supposed that a railroad must, of *necessity*, diminish the intrinsic value of unimproved lots in certain positions, it was competent for the defendants to prove results, and to show, from experience in other places, that lots similarly located with those of the plaintiff with reference to a railroad, had not been injured by it, and that persons, from choice, had bought and erected buildings upon lots situate nearer to the track of the road than many of the plaintiff's lots, that are claimed to be injured, are situated.

The matters offered to be established were facts pertinent to the issue, upon which the jury could profitably have applied their own common sense and discernment.

Upon the whole view of the case, I am persuaded that the rule to show cause ought to be made absolute.

Justice CARPENTER concurred in discharging the rule, on the ground that the judge before whom the trial was had was satisfied that justice had been done by the verdict.